

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-29-1999

# In Re: United Health Care Syst, Inc.

Precedential or Non-Precedential:

Docket 98-6490

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

## Recommended Citation

"In Re: United Health Care Syst, Inc." (1999). *1999 Decisions.* Paper 331.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/331

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 29, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-6490

IN RE: UNITED HEALTHCARE SYSTEM, INC.,
      Debtor

OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF UNITED HEALTHCARE SYSTEM, INC.,
      Appellant

v.

UNITED HEALTHCARE SYSTEM, INC.;
MEDICAL STAFF; DAIWA; LOCAL 1199J

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil Action No. 97-cv-02495
(Honorable Joseph A. Greenaway, Jr.)

Argued July 26, 1999

Before: SCIRICA and STAPLETON, Circuit Judges,
and SHAPIRO, District Judge*

(Filed: December 29, 1999)

_____

* The Honorable Norma L. Shapiro, United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.

DENNIS J. O'GRADY, ESQUIRE
(ARGUED)
Riker, Danzig, Scherer, Hyland
 & Perretti
One Speedwell Avenue
Headquarters Plaza
Morristown, New Jersey 07962-1981

 Attorney for Appellant,
 Official Committee of Unsecured
 Creditors of United Healthcare
 System, Inc.

LEO V. LEYVA, ESQUIRE (ARGUED)
GERALD H. GLINE, ESQUIRE
Cole, Schotz, Meisel, Forman
 & Leonard
25 Main Street
Hackensack, New Jersey 07601

 Attorney for Appellee,
 United Healthcare System, Inc.

ARNOLD S. COHEN, ESQUIRE
Balk, Oxfeld, Mandell & Cohen
50 Commerce Street
Newark, New Jersey 07102

 Attorney for Appellee,
 Local 1199J

RAYMOND G. HEINEMAN, ESQUIRE
Kroll & Heineman
300 Executive Drive, Suite 010
West Orange, New Jersey 07052

 Attorney for Appellee,
 JNESO District Council 1,
 International Union of Operating
 Engineers, AFL-CIO

2

OPINION OF THE COURT

SCIRICA, Circuit Judge.

This case brought under the Worker Adjustment and Retraining Notification Act (WARN Act), 29 U.S.C.S 2101 et seq., arises from the Chapter 11 bankruptcy of United Healthcare System, Inc. The Official Committee of Unsecured Creditors of United Healthcare System, Inc. appeals a judgment that former United Healthcare employees are entitled to WARN Act back pay, and receive first priority administrative status in the bankruptcy proceedings. Because we conclude United Healthcare was no longer an "employer" within the meaning of the WARN Act when it terminated these employees and therefore was not subject to the WARN Act, we will reverse.

I.

United Healthcare System, Inc. was a New Jersey not-for-profit corporation that provided hospital and healthcare services in the Newark area. Since 1993, United Healthcare had experienced financial difficulties. But these problems did not become acute until 1996, when the company suffered substantial operating losses and encountered trouble maintaining essential supplies (such as blood). Attempting to alleviate these problems, United Healthcare entered into partnership negotiations with Children's Hospital of Philadelphia and merger negotiations with Atlantic Health Care System. Nothing came to fruition.

Despite its difficulties, United Healthcare did not believe financial problems would force it to close and in mid-December of 1996, its board of directors unanimously approved a budget for 1997. The budget anticipated losses for the first three months of 1997 but projected positive revenues for the rest of the year and predicted a year-end surplus of $1.2 million. United Healthcare's President and Chief Executive Officer John Dandridge later testified that the budget represented the board's good-faith attempt to forecast United Healthcare's finances for the forthcoming

3

year. Shortly after approving the budget, United Healthcare's board commenced discussions with other potential merger partners or purchasers, retaining Merrill Lynch for assistance and to find additional potential partners.

In early 1997, United Healthcare's financial problems worsened and the company began to divert withholding and other tax payments to meet general operating expenses. On January 15, Primary Healthcare Systems made an offer to purchase United Healthcare and continue United Healthcare's operations in the existing Newark facilities with United Healthcare's employees. Taking into account Primary Healthcare's financial condition as well as the time and money it invested in preparing its offer, United Healthcare President Dandridge concluded Primary Healthcare could successfully complete the proposed purchase and continue United Healthcare's business.

As the parties continued to negotiate over Primary Healthcare's proposal in late January, United Healthcare's secured creditor Daiwa Healthco-2 L.L.C. warned that recent financial reports had caused it to doubt United Healthcare's financial viability. Responding that a computer error caused the reports to contain incorrect data, United Healthcare assured Daiwa that it would soon complete a transaction allowing United Healthcare's facilities to remain open and its employees to remain on the job. But this response did not allay Daiwa's fears and on February 3 Daiwa suspended funding to United Healthcare. As a result, United Healthcare was unable to meet its operating expenses, closed its emergency room and reduced its number of patients. To alleviate United Healthcare's financial problems and to allow it to increase its number of patients, the State of New Jersey gave United Healthcare an emergency funding advance of $5,000,000. After receipt of the advance, United Healthcare apparently increased its number of patients from 120 to 180. But, at the same time, United Healthcare accelerated its merger discussions and then issued requests for merger or acquisition proposals to several health care providers, four of which responded with proposals.

4

On February 13, 1997, Daiwa issued United Healthcare a notice of default terminating all financing. As a result, United Healthcare was unable to continue operations and meet daily expenses. Also on February 13, Blue Cross terminated, for non-payment, the health insurance United Healthcare provided its employees.

On Sunday, February 16, United Healthcare's board, management, medical staff, consultants and attorneys heard proposals for merger, joint venture or sale of assets and goodwill from Primary Healthcare Systems, St. Barnabas Corporation and UMDNJ/Cathedral Healthcare System, Inc. St. Barnabas and UMDNJ/Cathedral proposed to purchase only a portion of United Healthcare's assets and then terminate its operation. Primary Healthcare proposed to continue operating United Healthcare as a going concern and to retain 980 of United Healthcare's approximately 1,300 employees. Although United Healthcare's medical staff voted to accept Primary Healthcare's offer, United Healthcare's board voted to accept St. Barnabas' offer to purchase its assets and to close the hospital.

On February 19, United Healthcare advised the New Jersey Department of Health that it would close and surrendered its certificates of need.[1] On that same day, the Department of Health revoked United Healthcare's certificates of need, and issued new certificates of need to a St. Barnabas affiliate as required for the transfer of United Healthcare's services. Also on February 19, United Healthcare filed a voluntary Chapter 11 bankruptcy petition, and provided its approximately 1,300 employees with 60 days' notice of termination of employment pursuant to the WARN Act.[2] The notice explained that their

_____

1. Under New Jersey law, health care facilities are required to maintain certificates of need issued by the Department of Health. N.J.S.A. 26:2H-7 (West 1999) ("No health care facility shall be constructed or expanded, and no new health care service shall be instituted .. . except upon application for and receipt of a certificate of need . . . .").

2. As is more fully explained, the WARN Act requires an employer to provide employees 60 days' notice of a "plant closing" or "mass layoff." 29 U.S.C. S 2102. United Healthcare claims the WARN notice followed the bankruptcy filing; the Bankruptcy Court found the two acts were simultaneous.

employment would end on April 20 or within fourteen days of that date but stated that they should continue to report to work until United Healthcare closed. United Healthcare also filed an emergency application for the sale of its goodwill to St. Barnabas. Because all of United Healthcare's patients had either been transferred to the St. Barnabas hospital affiliate or sent home by February 21, within 48 hours after United Healthcare issued the WARN notice, its employees were unable to perform their regular duties but instead cleaned, took inventory and prepared the company's assets for sale.

On March 4, the Official Committee of Unsecured Creditors of United Healthcare System, Inc. ("Committee")3 filed a motion asking the Bankruptcy Court to order United Healthcare to terminate all employees immediately. On March 6, before the court ruled on the Committee's motion, United Healthcare informed 1,200 of its 1,300 employees that they were no longer to report to work. United Healthcare retained 100 employees to secure the plant facility and to maintain necessary equipment.

On March 7, United Healthcare and the Committee stipulated before the Bankruptcy Court that United Healthcare's February 19 WARN Act notice created a "$7.3 million payroll obligation." The parties agreed that United Healthcare's 1,200 furloughed employees were entitled to be paid for the sixteen days they actually worked, amounting to $1.7 million. But the parties could not agree whether the employees were entitled to WARN Act "back pay"4

_____

3. The Committee represents Unsecured Creditors' interests of approximately $20 million.

4. The WARN Act provides:

    (1) Any employer who orders a plant closing or mas s layoff in
    violation of section 2102 of this title shall be liable to each
aggrieved
    employee who suffers an employment loss as a result of such
    closing or layoff for--

    (A) back pay for each day of violation at a rate o f compensation
    not less than the higher of --

     (i) the average regular rate received by such employee during
    the last 3 years of the employee's employment; or

     (ii) the final regular rate received by such  employee....

29 U.S.C. S 2104(a).

for the remaining forty-four days, an amount of $5.1 million. United Healthcare asserted that the employees were entitled to WARN Act "back pay" for these forty-four days and were also entitled to first priority administrative claim status in bankruptcy under 11 U.S.C. SS 503(b)(1)(A) and 507(a)(1). The Committee responded that the employees were not entitled to WARN Act back pay because United Healthcare ceased to be an "employer" subject to the WARN Act once it surrendered its certificates of need on February 18. In the alternative, it also contended United Healthcare was excused from providing notice under the WARN Act's "faltering company" and "unforeseeable business circumstances" exceptions. Additionally, the Committee maintained that if United Healthcare's furloughed employees were entitled to "back pay" under the WARN Act, they held only unsecured claims limited to $4,000 per employee under 11 U.S.C. S 507(a)(3), rather than first priority administrative claims.

In an order dated March 26, 1997, the Bankruptcy Court rejected the Committee's arguments, holding that United Healthcare's employees were entitled to WARN Act back pay and that their claims should be granted first priority administrative claim status. In re United Healthcare System, Inc., No. 97-21785, slip op. (Bankr. D.N.J. Mar. 26, 1997). The Bankruptcy Court held that United Healthcare remained an "employer" subject to the Act after it filed its bankruptcy petition because it continued to employ its 1,300 person workforce for sixteen days after the Chapter 11 petition was filed. In reaching this conclusion, the court was guided by a Department of Labor WARN Act comment which provides, "where the fiduciary may continue to operate the business for the benefit of creditors, the fiduciary would succeed to the WARN obligations of the employers precisely because the fiduciary continues the business in operation." 54 Fed. Reg. 16042 (1989).

The Bankruptcy Court also concluded the so-called "unforeseeable business circumstances" exception, which excuses an employer from providing WARN notice if closing is not reasonably foreseeable sixty days in advance, 5 did not

_____

5. 29 U.S.C. S 2102(b)(2)(A) sets forth what has come to be known as the "unforeseeable business circumstances exception." It provides:

excuse United Healthcare from providing notice because it found there were "months of warning signals" that placed the board of directors on notice that "United was in financial extremis." Specifically, the court found United Healthcare had suffered substantial losses and had experienced "chronic" supply problems for more than a year before closing. In addition, the court noted that Daiwa had complained to United Healthcare about the "quality of financial information" since December 1996 and that the New Jersey Department of Health had advanced United Healthcare substantial future payments in January 1997.

The Bankruptcy Court also concluded that United Healthcare was not absolved of its WARN Act obligations by the Act's "faltering business" exception, which permits an employer to withhold notice if it is "actively seeking capital or business" that would allow it to postpone or avoid closing and if it reasonably believed that giving notice would have prevented it from obtaining the capital or business.6 The court determined the exception did not apply because United Healthcare's "deep, long-term and critical" financial problems prevented it from reasonably believing new capital or business would allow it to remain open.

_____

An employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required.

See Hotel Employees and Restaurant Employees Int'l Union Local 54 v. Elsinore Shore Associates, 173 F.3d 175, 184-87 (3d Cir. 1999) for a discussion of the "unforeseeable business circumstances exception."

6. This exception is set forth in 29 U.S.C. S 2102(b)(1):

An employer may order the shutdown of a single site of employment before the conclusion of the 60-day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably believed that giving the notice would have precluded the employer from obtaining the necessary capital or business.

Finally, the Bankruptcy Court concluded that United Healthcare's employees' WARN Act claims were entitled to first priority administrative status under 11 U.S.C. SS 503(b)(1)(A) and 507(a)(1) rather than treatment as unsecured claims for wages because the employees' post-petition services "clearly benefitted the estate" and were therefore "actual, necessary costs and expenses," 11 U.S.C. S 503(b)(1)(A), of preserving United Healthcare's bankruptcy estate.

The Committee appealed the Bankruptcy Court's judgment to the District Court, which affirmed. The District Court concluded without explanation that United Healthcare was an employer for "sixteen days after the bankruptcy filing." It also held that neither the faltering business exception nor the unforeseeable business circumstances exception applied because of United Healthcare's "sizable, long-term and critical" financial problems and because "merely refinancing or acquiring new lenders would not prevent the closing of the hospital." Finally, the Court held the employees' WARN Act claims were entitled to first priority administrative status because the employees had performed "necessary and valuable services."

The Committee has appealed.

II.

The Bankruptcy Court had jurisdiction under 28 U.S.C. S 157(b)(2)(B). The District Court had jurisdiction under 28 U.S.C. S 158(a). We have jurisdiction under 28 U.S.C. S 1291.

III.

We address only the threshold question on appeal: whether the Bankruptcy Court and the District Court correctly concluded United Healthcare continued as an "employer" within the meaning of the WARN Act after filing for Chapter 11 bankruptcy, and was therefore subject to the WARN Act notification requirements when it furloughed its 1,200 employees on March 6, 1997.[7]  Although we review

_____

7. Because we hold that United Healthcare was not subject to the WARN Act, we need not decide whether the WARN Act's "unforeseeable business

9

a bankruptcy court's findings of historical or narrative fact for clear error, see Mellon Bank v. Metro Communications, Inc., 945 F.2d 635, 642 (3d Cir. 1991), the parties do not dispute the accuracy of the Bankruptcy Court's findings of fact, which were undisturbed by the District Court. Instead, the parties dispute whether the facts were sufficient to support the Bankruptcy Court's legal conclusion that United Healthcare was an employer under the WARN Act, and had violated the Act's notice provisions when it terminated its employees on March 6, 1997. Because this dispute requires us to review the Bankruptcy Court's " `choice and interpretation of legal precepts and its application of those precepts to the historical facts,' " we apply plenary review. See id. (quoting Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir. 1981)).

A.

With certain exceptions, the WARN Act, 29 U.S.C.S 2101 et seq., requires an "employer" to provide its employees with sixty days' notice of a "plant closing" or "mass layoff." 29 U.S.C. S 2102.8 If the employer fails to do so, it may be

_____

circumstances" and "faltering business" exceptions apply or whether the "back pay" claims were entitled to first priority administrative claim status.

8. The statute defines "plant closing" as

the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees.

29 U.S.C. S 2101(a)(2).

The statute defines "mass layoff " as

a reduction in force which--

(A) is not the result of a plant closing; and

(B) results in an employment loss at the single si te of employment during any 30-day period of

10

liable for up to sixty days' back pay. See 29 U.S.C.
S 2104(a).

The Committee contends United Healthcare ceased to be
an "employer" under the WARN Act when it surrendered its
certificates of need, and filed for bankruptcy on February
19, 1997. From that date forward, the Committee
maintains, United Healthcare was no longer a business
enterprise operating as a going concern, but rather was a
company winding up its affairs and preparing for
liquidation. United Healthcare contends that after it filed its
bankruptcy petition, it continued as an "employer,"
operating its business for the benefit of creditors, and was
therefore subject to the WARN Act notice requirements.

As with all questions of statutory interpretation, we begin
with the language of the statute itself. See United States ex
rel. LaCorte v. SmithKline Beecham Clinical Lab., Inc., 149
F.3d 227, 232 (3d Cir. 1998); In re TMI, 67 F.3d 1119, 1123
(3d Cir. 1995). The WARN Act defines an "employer" as

> any business enterprise that employs--
>
> (A) 100 or more employees, excluding part-time
> employees; or
>
> (B) 100 or more employees who in the aggregate wor k
> at least 4,000 hours per week (exclusive of hours of
> overtime) . . . .

29 U.S.C. S 2101(a)(1). As another court of appeals has
explained, this language is general and not especially
helpful in determining whether a particular employer is
subject to WARN. See Adams v. Erwin Weller Co., 87 F.3d
269, 271 (8th Cir. 1996) (stating that section 2101(a)(1)
"does not tell us what it takes to be an employer subject to

_____

> (i)(I) at least 33 percent of the employees (e xcluding any part-
> time employees); and
>
> (II) at least 50 employees (excluding any part -time employees);
> or
>
> (ii) at least 500 employees (excluding any par t-time employees).

Id. S 2101(a)(3).

11

WARN"). But it does set forth two requirements: an "employer" must employ a certain number of employees and must also be a "business enterprise," a term the statute does not define. In this case, there is no doubt United Healthcare employed the requisite number of employees. But it is less clear that United Healthcare remained a "business enterprise" after it surrendered its certificates of need, stopped treating patients, and entered bankruptcy to liquidate its assets. Each of those events precluded United Healthcare from performing the everyday business functions of a hospital and health care service. On the other hand, despite those events, United Healthcare remained a corporation that employed for sixteen days a substantial number of employees to whom it assigned various tasks all related to shutting down its operations. Addressing the facts here in context, we do not believe WARN's plain language resolves whether United Healthcare was an "employer" required to provide sixty days notice prior to its termination of the 1,200 employees.

It is appropriate, therefore, to consider agency regulations and comments as well as the case law. See Hotel Employees, 173 F.3d at 181-83 (considering regulations, legislative history, cases and legislative purpose when WARN's plain language did not indicate statute's scope). The Department of Labor's comments to its regulations implementing the WARN Act suggest that whether an entity (bankrupt or otherwise) is an"employer" under the WARN Act depends in part on the nature of the entity's activities.

> [T]he term "employer" includes public and quasi-public entities which engage in business (i.e., take part in a commercial or industrial enterprise, supply a service or good on a mercantile basis, or provide independent management of public assets, raising revenue and making desired investments) . . . .

20 C.F.R. S 639.3(a)(1)(ii), 54 Fed. Reg. 16042, 16065 (1989) (emphasis added). Thus, in determining whether an entity is an "employer," we will consider whether the entity was "engage[d] in business" during the time prior to the plant closing or mass layoff. Elsewhere, the commentary

12

specifically addresses entities in bankruptcy at the time the closing or layoff occurred:

> [T]he Department does not think it appropriate to [exclude all bankrupt companies from the definition of "employer"]. Further, DOL agrees that a fiduciary whose sole function in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligations of the former employer because the fiduciary is not operating a "business enterprise" in the normal commercial sense. In other situations, where the fiduciary may continue to operate the business for the benefit of creditors, the fiduciary would succeed to the WARN obligations of the employer precisely because the fiduciary continues the business in operation.

54 Fed. Reg. at 16045. Thus, the question for us to resolve is whether United Healthcare, as the debtor-in-possession,[9] was operating as an ongoing business enterprise, or whether it was merely engaged in the liquidation of assets. As discussed in the Department of Labor commentary, merely filing for bankruptcy does not exempt an entity from the WARN Act. Instead, the commentary's focus on the bankruptcy fiduciary's responsibilities indicates that whether a bankrupt entity is an "employer" under the WARN Act depends in part on the nature and extent of the entity's business conduct and activities while in bankruptcy.

Two courts of appeals have relied upon this comment in determining whether a secured creditor can be an "employer" under the WARN Act. In Chauffers, Sales Drivers, Warehousemen & Helpers Union Local 572 v. Weslock Corp., the Court of Appeals for the Ninth Circuit examined the secured creditor's degree of control over the debtor, holding a secured creditor could be an employer if it "operates the debtor's asset as a `business enterprise' in the `normal commercial sense.' " 66 F.3d 241, 244 (1995) (quoting 54 Fed. Reg. 16045 (1989)). Drawing on Chauffers,

---

9. United Healthcare, as a debtor-in-possession, is a fiduciary for its estate and for its creditors. See 11 U.S.C.S 1107(a); Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985).

the Court of Appeals for the Eighth Circuit also focused on the nature and extent of the secured creditor's involvement with the debtor, holding a creditor acquires "employer" status when it "becomes so entangled with its borrower that it has assumed responsibility for the overall management of the borrower's business." Adams, 87 F.3d at 272.

The Bankruptcy Court, after reviewing the Department of Labor Commentary, held United Healthcare was subject to the WARN Act notification requirements, finding:

> In this case, there is no doubt that United Healthcare's plant closing and massive layoff of employees would, absent bankruptcy, trigger the notification requirements under WARN. In the Chapter 11 context, however, the debtor-in-possession ("DIP") asfiduciary succeeded to the WARN obligations of United . . . since debtor's 1,300 employees continued to work on a daily basis for sixteen days after the Chapter 11 petition was filed.

We disagree. In light of the Department of Labor commentary to the regulations and the cases cited, we believe that whether a bankrupt entity is an "employer" under the WARN Act depends on the nature and extent of the entity's business and commercial activities while in bankruptcy, and not merely on whether the entity's employees continue to work "on a daily basis." The more closely the entity's activities resemble those of a business operating as a going concern, the more likely it is that the entity is an "employer;" the more closely the activities resemble those of a business winding up its affairs, the more likely it is the entity is not subject to the WARN Act.

Based upon our review of the Bankruptcy Court's findings of fact, we find that United Healthcare, as the fiduciary in bankruptcy proceedings, was operating not as a "business operating as a going concern," but rather as a business liquidating its affairs. On February 18, 1997, United Healthcare surrendered its certificates of need; on February 19, it filed a voluntary bankruptcy plan under which it would liquidate its assets and cease to exist; and, no later than February 21, United Healthcare had discharged or transferred all of its patients and was no

14

longer admitting new patients. Significantly, after February 19, but in any event no later than February 21, its employees were no longer engaged in their regular duties but instead were performing tasks solely designed to prepare United Healthcare for liquidation.

We recognize that United Healthcare filed for Chapter 11 bankruptcy, ordinarily used to reorganize, rather than Chapter 7 bankruptcy, generally used to liquidate. But as discussed, United Healthcare's actions from the time it filed its Chapter 11 petition throughout the proceedings clearly demonstrate its intent to liquidate. Simultaneously, United Healthcare filed for bankruptcy, agreed to sell its assets and goodwill to St. Barnabas, and surrendered its certificates of need. Had United Healthcare's conduct and activities demonstrated a bona fide effort toward reorganization, the evidence may have shown that United Healthcare was an "employer" subject to the WARN Act.

We believe this analysis is consistent with the legislative purpose behind WARN. In Hotel Employees, we stated:

> The WARN Act was adopted in response to the extensive worker dislocation that occurred in the 1970s and 1980s. As companies were merged, acquired, or closed, many employees lost their jobs, often without notice. In some circumstances, the projected closing was concealed from the employees. Congress enacted WARN to protect workers and their families from these situations. WARN's notice period was designed to allow workers "to adjust to the prospective loss of employment, to seek and obtain retraining that will allow [them] to successfully compete in the job market." [20 C.F.R. 639(a)(1)]. The thrust of WARN is to give fair warning in advance of prospective plant closings. It would appear, therefore, that if an employer knew of a . . . . closing and failed to notify its employees, the WARN Act would apply.

173 F.3d at 182. In this case, there is no evidence United Healthcare knew in advance that it would be forced to close but concealed that knowledge from its employees. Instead, the record demonstrates that United Healthcare made repeated and intensive good-faith efforts to remain

15

financially viable and to ensure its employees would keep their jobs. Furthermore, United Healthcare willingly disclosed its financial difficulties to its employees, including them in its efforts to find a merger partner. Clearly, United Healthcare did not file for bankruptcy in an effort to avoid its WARN Act responsibilities.

Although we find WARN Act liability does not attach under these facts and circumstances, we do not foreclose the possibility that WARN Act liability may apply to other situations where an employer files for bankruptcy and then terminates its employees. An employer as fiduciary will succeed to its WARN Act obligations if an examination of the debtor's economic activities leading up to and during the bankruptcy proceedings reveals that the fiduciary has continued in an "employer" capacity, operating the business as an ongoing concern.

IV.

In conclusion, we do not believe United Healthcare continued as an "employer" within the meaning of the WARN Act when it assumed the role of fiduciary following the filing for bankruptcy. At that time, it ceased operating its business as a going concern and was simply preparing itself for liquidation. The bankruptcy plan it filed simultaneously with its Chapter 11 petition confirms this assessment: United Healthcare planned to sell its goodwill to St. Barnabas and would itself cease to exist. Given these prospects and the absence of any evidence United Healthcare structured its bankruptcy petition and the furlough of its employees to avoid WARN Act liability, we hold United Healthcare was no longer subject to the WARN Act when it furloughed its employees.[10]

For these reasons, we will reverse the District Court's order of November 5, 1998, to the extent it is inconsistent with this opinion and will remand for proceedings consistent with this opinion.

_____

10. We express no opinion on whether United incurred WARN liabilities at some point prior to the filing of its petition and whether the United employees have WARN claims entitled to priority under Section 507(a)(3).

16

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

17